## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
|     Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-03-387 (2) |
| | § | C.A. No. C-08-327 |
| DELFINO RAMOS, | § | |
|     Defendant/Movant. | § | |

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION TO VACATE,
## SET ASIDE OR CORRECT SENTENCE

Pending before the Court is Movant Delfino Ramos' ("Ramos") motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.  (D.E. 47.)[1]  The Court ordered the government to respond, and the government filed a combined response and motion to dismiss, or, in the alternative, for summary judgment on January 29, 2009.  (D.E. 56, 57.) Ramos sought and received an extension of time to file a reply, and his reply was received on May 4, 2009.  (D.E. 58, 66-67.)

The Court has considered all of the submissions of the parties and the record in this case.  As discussed in detail herein, Ramos' motion asserts three claims.  All three, which arguably fall outside the scope of his § 2255 waiver, fail on their merits.  Accordingly, the Court DENIES his § 2255 motion.

## I.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

---

[1]  Docket entry references are to the criminal case, C-03-cr-387.

1

## II.  FACTS AND PROCEEDINGS

### A.      Summary of Offense[2]

Ramos was a participant in a money laundering conspiracy.  The conspiracy involved utilizing illegal drug proceeds to rent vehicles and pay individuals to transport controlled substances and illegal drug proceeds from and to respective locations in South Texas and other metropolitan areas in the United States and Mexico.  Ramos owned and operated Somar Equipment, Inc. in Brownsville, Texas and utilized the business to launder drug money and to conceal the transportation of illegal drug proceeds.  Ramos also utilized two employees from his business as drivers and helped organize and supervise the shipment of illegal drug proceeds.

Ramos was held responsible at sentencing for laundering $3,227,603, the amount of currency seized from two of his employees on November 8, 2002 on Highway 77 in Sinton, Texas.  The two employees were in a rented U-Haul truck, which contained equipment for Ramos' business as well as duffel bags containing 95 bundles of U.S. currency.

### B.       Criminal Proceedings

On June 28, 2006, Ramos was charged in a superseding indictment.  (D.E. 7.)  The Indictment charges that from November 4, 2002 until November 8, 2002, Ramos and a co-defendant conspired with each other and others to conduct and attempt to launder funds that involved the proceeds of the distribution of controlled substances, in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(h).  The indictment charged a number of overt acts in furtherance

---

[2]  Unless otherwise noted, the facts of the offense as set forth herein are derived from Paragraphs 4 through 7 of the Presentence Investigation Report ("PSR").

of the conspiracy and also included a description of the manner and means of the conspiracy. (D.E. 7.)

On May 17, 2007, Ramos pleaded guilty to the Superseding Indictment, pursuant to a written plea agreement with the government.  (D.E. 27, 28.)  In exchange for his guilty plea and his waiver of appellate and § 2255 rights (discussed below), the government agreed to recommend that Ramos receive maximum credit for acceptance of responsibility and  to recommend a sentence at the lowest end of the applicable guideline range.  (D.E. 27 at ¶¶ 1-2.)

Additionally, the plea agreement included a waiver of Ramos' right to appeal (except under certain circumstances not applicable here) and a waiver of his right to file a § 2255 motion.  (D.E. 27 at ¶ 7 (emphasis in original).)  The agreement was signed by both Ramos and his counsel.  (D.E. 27 at 5.)

During the rearraignment, the prosecutor outlined Ramos' plea agreement, including a reference to Title 28, United States Code, Section 2255 and the statement that "he waives the right – that right to contest his conviction or sentence by any post-conviction proceeding." (D.E. 53, Rearraignment Transcript ("R. Tr.") at 19-20.)  After that summary was given, Ramos testified that the summarized plea agreement was his, that he had read it and discussed it with his attorney, that he understood it, and that he signed it.  (R. Tr. at 21.)

The Court specifically questioned Ramos under oath to ensure that his plea was voluntary and knowing and to ensure that he understood and was voluntarily relinquishing his appeal rights and right to file a § 2255 motion.  (R. Tr. at 22.)  Ramos told the Court that he had discussed with his attorney whether or not he should give up his appellate and § 2255

rights and that he felt "well-advised" on the issue.  (R. Tr. at 22.)  He also told the Court that he understood the waiver, and that he wanted to give up those rights.  (R. Tr. at 22.)

Ramos also testified that no one had threatened him or forced him to plead guilty, that no one had promised him leniency, that it was his decision to plead guilty and that he was pleading guilty because it was the "right thing to do" and what he wanted to do. (R. Tr. at 17-18.)  It is clear from the foregoing that Ramos' waiver of § 2255 rights was knowing and voluntary.  <u>See</u> Fed. R. Crim. P. 11(b)(1)(N) (obligating court to ensure defendant understands any waiver of § 2255 rights and appellate rights prior to accepting his plea).

The Court ordered the U.S. Probation Office to prepare a Presentence Investigation Report. (D.E. 29.)  The PSR calculated Ramos' base offense level for the offense at 26, but then added six levels pursuant to U.S.S.G. § 2S1.1(b)(1), because Ramos knew or believed that any of the laundered funds were the proceeds of, or were intended to promote the manufacture, importation or distribution of a controlled substance.  The PSR also added two levels pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because he was convicted under 18 U.S.C. § 1956, and three levels pursuant to U.S.S.G. § 3B1.1(b), finding that Ramos was a manager or supervisor.  After a three-level reduction for acceptance of responsibility, the total offense level was determined to be 34. (PSR at ¶¶ 16-26.)  Coupled with Ramos' criminal history category of I, Ramos' advisory guideline range was 151 to 188 months. (PSR at ¶ 44.)

Ramos, by and through counsel, filed a number of objections to the PSR.  He specifically objected to the role enhancement as well as objecting to certain facts in the PSR that supported that enhancement.

4

The case was called for sentencing on October 18, 2007.   At sentencing, the Court denied the defense motion for a continuance of sentencing.  (D.E. 54, Sentencing Transcript ("S. Tr.") at 4-9.  The Court initially denied Ramos' motion to file late objections to the PSR (S. Tr. at 14-15), but later concluded that the United States had waived any objections to the late filing, and allowed the objections.  (S. Tr. at 27.)  The Court heard evidence and argument as to Ramos' objection to the role enhancement.  (See generally S. Tr.)  The Court sustained the objection and stated that it would not impose a managerial role adjustment.  (S. Tr. at 90-91.)  With that change, Ramos' resulting guideline range was 108 to 135 months. (S. Tr. at 91.)

The  Court sentenced Ramos to 124 months in the custody of the Bureau of Prisons, to be followed by a three-year term of supervised release, and also imposed a $100 special assessment.  (D.E. 44, 45.)  Judgment was entered against him on October 24, 2007.  (D.E. 45.)  Consistent with his waiver of appellate rights, Ramos did not appeal.  Ramos' § 2255 motion was received by the Clerk on October 8, 2008. (D.E. 47.)  It is timely.

### III.  MOVANT'S ALLEGATIONS

In his § 2255 motion, Ramos lists three grounds for relief.  In his first ground, he argues that he entered into his guilty plea without full knowledge of the offense, the defenses and the actual evidence against him. (D.E. 47 at 5.)  Specifically, he argues that his counsel failed to properly advise him about the offense and advised Ramos to enter into a "crime he did not commit."  (D.E. 47, Supp. Mem. at 2.).  He appears to be arguing that he was guilty of money laundering, but that there were not any illegal drugs involved.  He further claims that his attorney told him that if he did not take the plea, that the United States "would get

5

another indictment against him for conspiracy to distribute a controlled substance and proceed to trial.  Also, that he would be found be found [sic] guilty and receive a life sentence in prison." (D.E. 47, Supp.  Mem. at 1.)

Second, Ramos argues that his conviction was "entered in error" in light of the Supreme Court's decisions in United States v. Santos, 533 U.S. ___, 128 S. Ct. 2020 (2008) and Cuellar v. United States, 533 U.S. ___ , 120 S. Ct. 1994 (2008).  Specifically, he argues that, under the holdings in these cases, he is not actually guilty of the offense of money laundering and it was therefore erroneous of counsel to advise him to enter a guilty plea.

Third and finally, he claims that his counsel was constitutionally ineffective because he failed to review the government's evidence against Ramos before advising him to enter into the plea agreement.  He specifically faults counsel for not providing copies of documents and evidence against him for Ramos to review.  (D.E. 47, Supp. Mem. at 8-9.)  Based on this alleged failure to research and investigate, Ramos argues that his plea and his waiver of appellate rights and waiver of § 2255 rights are invalid.  (D.E. 47 at 5; Supp. Mem. at 8-9.)

In its response, the government moves for summary dismissal of Ramos' entire motion on the basis of his waiver of § 2255 rights. (D.E. 56.)  In the alternative, the government argues for dismissal of the claims advanced by Ramos. (D.E. 56.)  The government has also provided the affidavit of Ramos' counsel in the underlying criminal proceedings, Ricardo L. Salinas. (See Exhibit A to D.E. 56, Affidavit of Ricardo L. Salinas.)  The Court grants the United States' motion to expand the record to include the affidavit and has considered it.

For the reasons set forth herein, Ramos' claims fail.

## IV.  DISCUSSION

**A.    28 U.S.C. § 2255**

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: (1) constitutional issues, (2) challenges to the district court's jurisdiction to impose the sentence, (3) challenges to the length of a sentence in excess of the statutory maximum, and (4) claims that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996). "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." United States v. Ramos, 955 F.2d 367, 368 (5th Cir. 1992). "[A] collateral challenge may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165 (1982).

Ramos faces at least two significant hurdles that could preclude consideration of some or all of his claims. The first of these is that Ramos waived his right to file a § 2255 motion. All three of his claims, however, essentially challenge the voluntariness of his plea or allege ineffective assistance of counsel with regard to counsel's advice to enter into the plea agreement. Thus, his claims arguably fall outside the scope of his § 2255 waiver. See, e.g., United States v. White, 307 F.3d 336, 343-44 (5th Cir. 2002) (an ineffective assistance claim survives a waiver "only when the claimed assistance directly affected the validity of that waiver or the plea itself").

The second hurdle Ramos faces is that of potential procedural default. That is, because Ramos did not appeal, he has arguably defaulted on any of his claims that could have

been brought on appeal.  See United States v. Lopez, 248 F.3d 427, 433 (5th Cir. 2001);
United States v. Kallestad, 236 F.3d 225, 227 (5th Cir. 2000).  A district court may consider
a defaulted claim only if the petitioner can demonstrate either (1) cause for his default and
actual prejudice or (2) that he is actually innocent of the crime charged.  Bousley v. United
States, 523 U.S. 614, 622 (1998); United States v. Jones, 172 F.3d 381, 384 (5th Cir. 1999).

The Court does not reach any conclusions herein as to whether Ramos has overcome
either of these hurdles.  Instead, the Court concludes that, even if his claims were properly
before the Court, they fail.  thus, the Court will address the merits of his claims, rather than
denying his § 2255 motion on a procedural basis.

## B.    Alleged Ineffective Assistance of Counsel As to Plea

Ramos' first and third claims allege that his counsel was ineffective in giving advice
related to his plea.  His first ground claims that counsel, Ricardo Salinas, misadvised him
concerning the elements of his offense.  His third ground for relief alleges that Salinas failed
to review the evidence against Ramos and to provide Ramos with a copy of documents and
other evidence that the United States had against Ramos.

An ineffective assistance of counsel allegation presented in a § 2255 motion is
properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466
U.S. 668 (1984).  United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001).  To prevail on
a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's
performance was both deficient and prejudicial.  Id.  This means that a movant must show
that counsel's performance was outside the broad range of what is considered reasonable
assistance and that this deficient performance led to an unfair and unreliable conviction and

sentence.  United States v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001).  If the movant

fails to prove one prong, it is not necessary to analyze the other.  Armstead v. Scott, 37 F.3d

202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the

defendant makes an insufficient showing on one"); Carter v. Johnson, 131 F.3d 452, 463 (5th

Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an

ineffective assistance claim.").

Applying these standards to Ramos' claims, the Court first notes that it finds no merit

in Ramos' contention that Salinas failed to review the evidence against Ramos or in his

contention that Salinas was ineffective for failing to "show" Ramos that evidence.  As

Salinas noted in his affidavit, the United States Attorney's Office in the Corpus Christi

Division has an "open file policy" that allows defense counsel to look at all the United

States' discovery and to make notes, but does not allow copies of reports or exhibits. (D.E.

56-2, Salinas Affidavit at 2.)  Salinas testifies in his affidavit (and told the court at

rearraignment, in Ramos' presence), that he had spent hours reviewing the  evidence in the

case and discussing it with Ramos.  (R. Tr. at 14.) Ramos does not dispute that counsel

discussed with him the evidence, but merely complains that counsel did not provide him with

a copy.  The Court finds no deficiency in counsel's handling of this case, particularly in light

of the U.S. Attorney's policy regarding its files.  Moreover, Ramos has not alleged or shown

any specific prejudice as a result of the fact that he did not personally review any particular

document.  Thus, Ramos has wholly failed to show deficiency on his third claim.

Moreover, the Court concludes that Ramos' first and third claims also fail because he

cannot establish the prejudice prong of his ineffective assistance claim.  In order to show that

he suffered prejudice as a result of ineffective assistance of counsel during the plea process, Ramos would have to show that, absent his counsel's deficiencies, he would have proceeded to trial.  See United States v. Glinsey, 209 F.3d 386, 392 (5th Cir. 2000) (in order to show prejudice as a result of ineffective assistance during the guilty plea process, a defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial") (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)).  This is a showing that cannot be met here.  The rearraignment transcript clearly establishes that Ramos' decision to plead guilty was his own and that it was entirely voluntary.

At his rearraignment, Ramos testified that he had had enough time to discuss his case with his attorney and that he was satisfied with his services.  (R. Tr. at 6-7.)  He further testified that counsel was following his instructions and that he had had the opportunity to ask his attorney all of the questions that he wanted.  (R. Tr. at 7.)  The Court informed Ramos of the various trial rights available to him, and he testified that he understood that if he pleaded guilty, he would be giving up those trial rights.  (R. Tr. at 7-10.)

The Court specifically explained the charge in the indictment and what the United States would have to prove at trial.  At the conclusion of the Court's explanation, the following exchange took place:

> THE COURT ... Do you understand that the Government would have to prove all of those things as the object of the conspiracy? Your intent, your knowledge, the financial transaction aspect of it, all being designed to promote drug trafficking or to cover up drug trafficking by hiding the location or nature of the ownership of the drugs.  Do you understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you believe that's what you did?

THE DEFENDANT:  Yes.

(R. Tr. at 13.)

The Court then ensured that his counsel had discussed with Ramos the nature of the charges against him and the indictment, and both Ramos and his counsel, Salinas, told the Court that a discussion had occurred.  Mr. Salinas' statement to the Court indicated that there had been a four-hour meeting with the case agent, Ramos and Salinas about the evidence against him.  Salinas further explained:

> MR. SALINAS:  ...  And in these discussions we realized and he realized that when he made these arrangements he understood that the funds were derived from some form of illegal activity. And the way they were secreted in the tractor trailer and the items and that he had talked to other individuals to bring these monies down in the valley obviously when we went through all of that which was more or less a four hour process, Judge ...
>
> THE COURT:  Well, did you know that the drugs were – did you know the money was drug money?
>
> THE DEFENDANT:  No, not really.  I knew –
>
> THE COURT:  What'd you think it was?
>
> THE DEFENDANT:  No, I knew it was something illegal, but exactly what it was for.
>
> THE COURT:  What'd you think it was?  If you didn't know, did you believe it was drug money?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT: Because you weren't there when the drugs were sold, but somebody told you to bring – take $3,000,000 back

down to the valley.  When they did that, did you ask what it was for?  I mean, why couldn't they just put it in the bank?

THE DEFENDANT:  No, sir, I didn't.

THE COURT:  Okay.  Why didn't you ask – ask why didn't they just put it in the bank?

THE DEFENDANT:  Because I more or less knew it was from illegal – illegal.

THE COURT:  So what illegal activity did you think it was?

THE DEFENDANT:  Drugs.

THE COURT:  Why did you think it was drugs?

THE DEFENDANT:  Excuse me?

THE COURT:  Why did you think it was drugs?

THE DEFENDANT:  Because of the large amount of money.

(R. Tr. at 14-15.)

Later, the prosecuting Assistant United States Attorney set forth the facts the government believed it could prove at trial, which included a statement that co-conspirators would testify that the $3.2 million they brought back in the U-Haul was money "that was the proceeds of a drug trafficking – cocaine trafficking crime."  (R. Tr. at 26.)  The following exchange between the Court and Ramos then took place:

THE COURT:  Is that what happened?

THE DEFENDANT:  Excuse me?

THE COURT:  Is that what happened?

THE DEFENDANT: Well, it wasn't for the – purchase of more cocaine.

THE COURT:  I can't hear you.

12

THE DEFENDANT:  It wasn't for the purchase – I never said it was for the purchase of more cocaine 'cause I didn't know exactly what the money was –

THE COURT:  Well, was it for the –

THE DEFENDANT:  – whether it was that or –

THE COURT:  Was it for the purchase of – or the payment of cocaine that had already been delivered?

THE DEFENDANT:  That I didn't know.  Like I said, it was just a – like I said, it was just the transportation of the money.

MR. SALINAS:  Your Honor, can I add something briefly?  Is it the –

THE COURT:  All right.  Let me just ask – let me just understand what happened.

So you were sitting where in Brownsville when you – the conversation with the Meiers – you have a conversation with the Meirs one day in Brownsville?

THE DEFENDANT:  No, in Mexico, Matamoras.

THE COURT: Matamoras, Okay.  And –

THE DEFENDANT:  But it was only – it was only one person, sir.

THE COURT:  Who was there?

THE DEFENDANT:  James – Mike Meier.

THE COURT: Mike Meiers?

THE DEFENDANT:  Yeah.  he was the only one there.

THE COURT:  Meirs?  All right.  Yes, Meirs.  It is Meirs, not Miers, Meier.  You were there?

THE DEFENDANT:  Yes.

THE COURT:  Who else was there?

THE DEFENDANT:  My uncle.

13

THE COURT:  Okay.  And why was your uncle there?

THE DEFENDANT:  Excuse me?

THE COURT:  Why was your uncle there?

THE DEFENDANT:  To instruct Mike to – of how he was going to go up there and bring down the money.

THE COURT:  Okay.  And is your uncle in the drug business?

THE DEFENDANT:  He was before.

THE COURT:  He was in the drug business at this time?

THE DEFENDANT:  No, he hadn't done that for a while, 'cause he was just hired to bring – transport the money.

THE COURT:  And did he hire you to help him?

THE DEFENDANT:  No, sir.

THE COURT:  Okay.  Did he get you to help him?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  Why did he come to you for help?

THE DEFENDANT:  He was running out of options.  He – see he – he was hired to do it and he was running out of options to bringing it down.

...

THE COURT:  And when you sent the money [to the Meiers to rent the U-Haul vehicle], did you know that they were going to bring money back from the United States into Mexico?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And with respect to that money did you believe that that money was from some form of unlawful activity?

THE DEFENDANT:  Yes.

14

THE COURT:  What did you believe – what form of unlawful activity did you believe that money was?

THE DEFENDANT:  Some sort of drugs.

(R. Tr. at  27-33.)

Consistent with Rule 11, Fed. R. Crim. P., the Court explained to Ramos that he faced a maximum punishment of twenty years in prison, and a maximum fine of $ 5000,000 or twice the value of property involved, so in this case could be double the approximately $3,000,000.  (R. Tr. at 16.)  The Court also informed him that there was a mandatory $100 special assessment, a minimum supervised release term of three years and a maximum supervised release term of three years.  (R. Tr. at 16-17.)  Ramos testified that he understood. (R. Tr. at 17.)  As previously noted, Ramos further testified that no one had threatened him or forced him to plead guilty, no one had promised him leniency, and that his decision to plead guilty was entirely voluntary.  (R. Tr. at 17-18.)

Ramos' sworn statements in open court are entitled to a strong presumption of truthfulness.  United States v. Lampaziane, 251 F.3d 519, 524 (5th Cir. 2001) (citing Blackledge v. Allison, 431 U.S. 63, 74 (1977)).   Indeed, the Fifth Circuit affords "great weight to the defendant's statements at the plea colloquy."  United States v. Cothran, 302 F.3d 279, 283-84 (5th Cir. 2002).  Ramos' sworn statements show that he understood the charges against him, he understood the possible maximum sentence he faced, he understood he was waiving his appellate rights, and that his guilty plea was voluntary.

In short, Ramos cannot establish that he would have proceeded to trial absent the alleged deficiencies of counsel.  Thus, his claims of ineffective assistance in the plea process fail.

## C.    Claim Based on <u>Santos</u> and <u>Cuellar</u>

Ramos' second claim is based on two cases that were pending before the Supreme Court at the time of Ramos' sentencing.  The two cases, <u>United States v. Santos</u>, 128 S. Ct. 2020 (2008) and <u>Cuellar v. United States</u>, 128 S. Ct. 1994 (2008), were both decided on June 2, 2008.  Ramos was sentenced on  October 18, 2007.  Because he did not appeal, his conviction became final on November 1, 2007, before the cases were decided.

The United States' substantive response to Ramos' second claim inexplicably construes it as a challenge to the application of the sentencing guidelines and does not address or even cite to <u>Santos</u> or <u>Cuellar</u>.  (<u>See</u> D.E. 56 at 18-19.)  In fact, however, the claim is properly construed as raising two distinct arguments, neither of which have anything to do with the sentencing guidelines.   First, Ramos argues that the conduct to which he pleaded guilty does not constitute the offense of money laundering, based on the Supreme Court's decisions in <u>Santos</u> and <u>Cuellar</u>.  Second, he claims that his counsel was ineffective for failing to take into account the arguments in those decisions, or to anticipate them, when he advised Ramos to plead guilty.

As set forth herein, Ramos is not entitled to relief on either of these claims.  Even assuming that these two decisions are retroactively applicable to his § 2255 motion,[3] these

---

[3] The Supreme Court has not held that <u>Santos</u> is retroactive, as would be necessary to render an otherwise untimely § 2255 motion timely under § 2255(3), and as required in order to fall within

16

cases do not render him innocent of the charges against him.  Moreover, because these cases are of no benefit to Ramos, counsel was not deficient for failing to raise an anticipatory challenge based on the holding in either case.  See United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

## 1. **Cuellar**

In Cuellar v. United States, 128 S. Ct. 1994 (2008), the Supreme Court addressed the elements of a provision of the federal money laundering statute that prohibits international transportation of the proceeds of unlawful activities, 18 U.S.C. § 1956(a)(2)(B)(I).   A unanimous court discussed the three elements that the government had to prove in the case to sustain the defendant's conviction under this provision:

---

the savings clause of § 2255 (which allows a motion under 28 U.S.C. § 2241 under certain circumstances).  Most of the other district courts that have addressed the retroactivity of Santos have been faced with one of those two scenarios.  See, e.g., United States v. McDade, 2009 WL 1043900 (W.D. La. April 17, 2009); Stewart v. Keffer, 2009 WL 1076762 (W.D. La. April 21, 2009) (order adopting Report and Recommendation); Johal v. United States, 2009 WL 210709 (W.D. Wash. Jan. 28, 2009);  Vaughan v. United States, 2008 WL 2945449 (W.D. N.C. July 25, 2008);

In an otherwise timely, first § 2255 motion, however, as Ramos has filed here, it is not necessary that the Supreme Court  have pronounced that a decision is retroactive in order for it properly to be given retroactive effect.  Instead, a decision's retroactivity will turn on whether it is a substantive or procedural rule.   The rule is that "[n]ew substantive rules generally apply retroactively.  This includes decisions that narrow the scope of a criminal statute by interpreting its terms." Schriro v. Summerlin, 542 U.S. 348, 351 (2004); see also United States v. McPhail, 112 F.3d 197, 199 (5th Cir. 1997) (a case articulating what elements must be proven to sustain convictions generally are considered substantive, and are generally retroactive to cases on collateral review). As noted, this Court assumes, without deciding, that Santos and Cuellar set forth a substantive rule that would apply retroactively to otherwise timely first § 2255 motions.  See also, Santana v. United States, 2009 WL 1228556, *1 & n.2  (W.D. Wash. May 4, 2009) (a timely § 2255 case in which the United States conceded that Santos was a substantive change of law and thus applied retroactively on collateral review).

that petitioner (1) attempted to transport funds from the United
States to Mexico, (2) knew that these funds "represent[ed] the
proceeds of some form of unlawful activity," *e.g.,* drug
trafficking, and (3) knew that "such transportation" was
designed to "conceal or disguise the nature, the location, the
source, the ownership, or the control" of the funds.

128 S. Ct. at 2002.   The third of these three elements was at issue in <u>Cuellar</u>.  As to this

element, the Court held that merely hiding or concealing funds during transportation was

insufficient.  <u>Id.</u> at 2003.  Rather, the element required proof that the transportation was

designed to conceal or disguise the nature, location, source, ownership or control of the

funds.  <u>Id.</u> at 2006.  In <u>Cuellar</u>, the United States had failed to present evidence sufficient for

a reasonable jury to find this element.  Thus, the conviction could not be sustained.

Ramos' case is easily distinguishable from <u>Cuellar</u>.  The defendant in <u>Cuellar</u> went

to trial and the United States failed to present sufficient proof of his knowledge that the

transportation was designed to conceal a listed attribute of the funds.  In the instant case,

Ramos pleaded guilty and expressly admitted at his rearraignment this element of the offense.

 (<u>See</u> R. Tr. at 14-15 (quoted <u>supra</u> at pages 11-12).  Ramos admitted that he knew that the

$3.2 million dollars could not just be put in the bank because it was from illegal activity.  His

own testimony therefore clearly establishes the third element discussed in <u>Cuellar</u>.

Additionally, there were other co-conspirators willing to testify about the transportation of

the money, and they also likely would have testified that they knew the funds were being

transported to disguise their illegal nature, their source, ownership, or control.  In short,

<u>Cuellar</u> provides no benefit to Ramos because the facts in the indictment he pleaded guilty

to, and his statements at the rearraignment, sufficiently establish the elements of the charged crime.

### 2. **Santos**

The <u>Santos</u> decision is less straightforward, both in its holding and its application. Indeed, commentators and courts alike have noted the lack of clarity.  <u>See</u> <u>United States v. Brown</u>, 553 F.3d 768, 783 (5th Cir.2008) ("[<u>Santos</u>] raises as many issues as it resolves for the lower courts."); Marc Fernich, <u>Money Laundering After 'Santos': A Supreme Mess</u>, 240 N.Y.L.J. 4, October 17, 2008 at 4 (describing <u>Santos</u> as having an "opaque holding" with "murky precedential implications").

The defendants in <u>Santos</u> were operating a stand-alone illegal gambling operation, and it was this unlawful activity that generated the laundered money.  After their convictions and sentences (on both money laundering and gambling offenses) were affirmed, the defendants filed motions under 28 U.S.C. § 2255.  <u>Santos</u>, 128 S. Ct. at 2023.  The only challenge the district court found meritorious was a challenge to their laundering convictions based on a later-decided Seventh Circuit decision which held that the term "proceeds" in the federal money-laundering statute applies only to transactions involving criminal profits, not merely criminal receipts.  <u>Id.</u>  Applying that holding, the district court found no evidence that the transactions on which the money-laundering convictions were based involved profits, as opposed to receipts.  Specifically, the evidence showed that the laundered money was used to pay those involved in the gambling operation (runners, winners and collectors).  <u>Id.</u>  The district court therefore vacated the money-laundering convictions, and the Seventh Circuit Court of Appeals affirmed.  <u>Id.</u>

Before the Supreme Court, a plurality of four justices determined that the phrase "proceeds of some form of unlawful activity," found in 18 U.S.C. § 1956(a)(1) was ambiguous. The rule of lenity, which requires ambiguous terms in criminal statutes to be construed in favor of the defendant, therefore dictated that the term "proceeds" should be defined as the "profits" of the activity, rather than merely the "receipts." 128 S. Ct. at 2025. According to the plurality opinion, authored by Justice Scalia, adoption of the "receipts" definition would create a so-called "merger problem," described as follows:

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955 would "merge" with the money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1).

128 S. Ct. at 2026.

As described by the plurality, the money-laundering charges against one defendant were based on payments to the lottery winners and employees, and the charge against the other defendant was based on his receipt of payments. 128 S. Ct. at 2031. Neither type of transaction could be fairly characterized as involving "profits" and therefore the Seventh Circuit's decision vacating the defendants' money-laundering convictions was affirmed. 128 S. Ct. at 2031.

Justice Stevens wrote a concurring opinion in <u>Santos</u> that was necessary to forming a majority. <u>See United States v. Fernandez</u>, 559 F.3d 303, 316 (5th Cir. 2009) (discussing

the Santos opinion and its precedential implications).  In Justice Stevens' view, Congress

intended "proceeds" to have different meanings in different contexts.  He agreed that in the

context of a stand-alone illegal gambling operation, Congress must have meant "proceeds"

to mean profits, rather than receipts; otherwise, the "merger problem" discussed above would

exist.  In other contexts, however, he believed that a merger problem would not exist, and

that in those contexts the term "proceeds" could mean "receipts."  Santos, 128 S. Ct. at 2033-

34 (Stevens, J. concurring).

The precedential implications of Santos are unclear, given the plurality and Justice

Stevens' rationale for joining in the judgment.  Indeed, the opinions in the case itself disagree

over those implications.  For example, the plurality opinion espoused the view that the

holding of the Court was that the term "proceeds" means "profits"  when there is no

legislative history to the contrary.  128 S. Ct. at 2031.  Justice Stevens disagreed, implying

instead that his conclusion that "proceeds" means "profits" was limited to the context of an

unlicensed stand-alone gambling business, but that, "[i]n other applications of the statute not

involving such a perverse result," he would agree with the dissent's view of the

Congressional intent as to the term "proceeds."  128 S. Ct. at 2033-34 & n.7 (Stevens, J.,

concurring).  Additionally, the principal dissent specifically noted that five Justices agreed

with Justice Stevens' view that the term "proceeds" includes "gross revenues from the sale

of contraband and the operation or organized crime syndicates involving such sales." See 128

S. Ct. at 2035-36 & n.1 (Alito, J., dissenting); see also 128 S. Ct. at 2032 (Stevens, J.,

concurring) ("I cannot agree with the plurality that the rule of lenity must apply to the

definition of "proceeds" for [the sale of contraband and the operation of organized crime

syndicates involving such sales]").

The Supreme Court has instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest ground.'" See Marks v. United States, 430 U.S. 188, 193 (1977) (citation omitted). As is apparent by the disagreement within the Court itself, however, it is difficult to determine the "narrowest" ground of the Santos case. Indeed, in light of the foregoing differing opinions by the justices involved in deciding Santos, it is not surprising that lower courts faced with the decision have struggled to determine Santos' precedential value. See, e.g., Brown, supra, 553 F.3d at 783 ("The precedential value of Santos is unclear outside of the narrow factual setting of that case ...).

In any event, what *is* clear is that neither a majority of the Supreme Court, nor the Fifth Circuit, has expressly held that "proceeds" means "profits" in the context of money-laundering charges arising out of illegal drug smuggling. In the absence of any such binding authority directing this Court to apply Santos to such a case, the Court declines to do so. Other courts to have addressed the scope of Santos have reached similar conclusions. See, e.g., United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009) (where the funds laundered by the defendant were the proceeds of illegal drug trafficking and not an illegal gambling operation, Santos is inapplicable); United States v. Howard, 2009 WL 205649 *10 (4th Cir.2009) ("Because Santos does not establish a binding precedent that the term 'proceeds' means 'profits,' except regarding an illegal gambling charge, we are bound by this Court's precedent establishing that 'proceeds' means 'receipts.' "), pet. for cert. filed, (U.S.

Apr. 13, 2009) (No. 08-9814); <u>United States v. Fleming</u>, 287 Fed. Appx. 150 (3d Cir.), <u>cert.</u> <u>denied,</u> (2008) (unpublished) (post-<u>Santos </u>decision relying on dissent's statement that "five Justices agree with the position" that "proceeds" includes gross revenues for drug sales and refusing to vacate conviction); <u>Kenemore v. United States</u>, 2008 WL 4965948 *6 (E.D. Tex.2008) ("The inescapable conclusion-considering the respective opinions of Justices Scalia and Stevens regarding *stare decisis*-is that 'proceeds' refers to 'profits' not 'receipts' in money laundering prosecutions involving stand-alone illegal gambling operations."); <u>see</u> <u>also</u> <u>United States v. Prince</u>, 2008 WL 4861296, *7 (W.D. Tenn. September 9, 2008) (unpublished)  (collecting authority and noting the "varied conclusions" about the applicability of the holding in <u>Santos</u> to cases where the illegal activity is something other than illegal gambling).

For the foregoing reasons, the Court concludes that neither <u>Cuellar</u> nor <u>Santos</u> provide any benefit to Ramos, and that counsel was not ineffective for failing to raise a challenge or give advice based on the rationale expressed in either case.  Ramos' second claim thus fails.

## V.  CONCLUSION

For the above-stated reasons, Ramos' motion under 28 U.S.C. § 2255 (D.E. 47) is DISMISSED WITH PREJUDICE.

It is so ORDERED this 7th day of August, 2009.

_____
HAYDEN HEAD
CHIEF JUDGE